# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

BRANDI CURRY,          )
                                )
      Plaintiff,         )
                                )
v.                          )     Case No.: 2:16-cv-02008-SGC
                                )
KOCH FOODS, INC., et al.,     )
                                )
      Defendants.      )

## MEMORANDUM OPINION & ORDER[1]

This is a sexual harassment case brought by Brandi Curry against Koch

Foods, Inc., and Alex Huddleston. (Doc. 1). Against Koch Foods, Curry asserts

claims for "hostile work environment" sexual harassment in violation of Title VII

of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; retaliation

in violation of Title VII and 42 U.S.C. § 1981; and state law negligence. (*Id.* at 8-

9, 11, 13). Against Huddleston, Curry asserts state law claims for invasion of

privacy and assault. (*Id.* at 12-13). Additionally, Curry seeks to impose liability

on Koch Foods for Huddleston's intentional torts. (*Id.*). Pending before the

undersigned are motions for summary judgment filed by Koch Foods and

Huddleston. (Docs. 37 & 43). For the reasons discussed below, Koch Foods'

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge
pursuant to 28 U.S.C. § 636(c). (Doc. 16).

motion is due to be denied in part and granted in part, and Huddleston's motion is due to be denied.

## I. FACTS[2]

### A. Background

Curry was hired by Koch Foods on September 4, 2014, to work as a General Laborer at its Ashland, Alabama poultry processing plant and assigned to the evisceration department in November 2014. (Doc. 45-1 at 18-19). She was promoted to the position of Inspector Helper in that department on June 2, 2015. (*Id.* at 19). An Inspector Helper is a Koch Foods' employee who works next to an employee of the federal government known as a United States Department of Agriculture Inspector ("USDA Inspector") on a production line at the plant. (*Id.* at 21-23). From one side of a stand, the USDA Inspector inspects birds coming down a line and signals to the Inspector Helper on the other side of the stand which birds to mark for trimming or send to "washout." (*Id.* at 22-23, 32-33, 65; Doc. 46-2 at 119). Koch Foods' job description for Inspector Helpers states these employees "follow the government inspector's instructions to properly mark and/or pull below standard birds from the processing line." (Doc. 46-2 at 119). Koch Foods cannot run its production lines without USDA oversight. (Doc. 45-1 at 22). In both her

---

[2] The following facts are undisputed, unless otherwise noted. They are viewed in the light most favorable to Curry, as the non-movant, with Curry given the benefit of all reasonable inferences.

position as a General Laborer and an Inspector Helper, Curry worked the third shift, which ran from approximately 8:43 P.M. to 5:45 A.M. (*Id.* at 18-19, 21).

During the time in question, Huddleston was a USDA Inspector assigned to Koch Foods' Ashland plant. (Doc. 45-2 at 5). He worked the first shift, which ran from approximately 5:45 A.M. to 2:15 P.M. (*Id.* at 11). However, he sometimes began his shift approximately 30 minutes early. (*Id.* at 5, 11). When he did so, his shift overlapped with Curry's shift for approximately 30 minutes. (*Id.* at 12; Doc. 45-1 at 21, 24). Both as a General Laborer and as an Inspector Helper, Curry sometimes worked alongside Huddleston when he began his shift early. (Doc. 45-1 at 21, 24-25).

Curry testified she initially got along well with Huddleston. (*Id.* at 25). A few weeks after Curry first worked with Huddleston, he asked her whether she was in a relationship with a female Koch Foods' employee named Brandy. (*Id.* at 25-26). This question did not bother Curry. (*Id.* at 26). Huddleston also told Curry he had undergone a surgery on his "private area," his "dick didn't work," he "didn't have anything going on [] down there," and he loved oral sex. (*Id.* at 26, 59).[3] These comments did not make her uncomfortable. (*Id.* at 26-27).[4] Curry felt

_____

[3] With respect to the offensive language quoted in this opinion, the undersigned adopts the perspective expressed by the Eleventh Circuit in *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 803 (11th Cir. 2010) ("We recite the profane language that allegedly permeated this workplace exactly as it was spoken in order to present and examine the social context in which it arose. We do not explicate this vulgar language lightly, but only because its full consideration is

like Huddleston was just a friend sharing this information with her.  (*Id.* at 26).

Curry testified Huddleston began making inappropriate comments after he heard

she was in a relationship with a female Koch Foods' employee named Dee Dee.

(*Id.* at 26).

## B. Huddleston's Comments and Conduct Between September 2014 and November 2015

Curry testified that between the time she was hired and the time she was

promoted to the position of Inspector Helper, Huddleston made the following

unwelcome comments to her:

- He asked her whether her "pussy ha[d] a smell," told her she didn't have a "smell down there," and told her his wife "has smell when y'all do that little thing y'all do." (*Id.* at 27, 57).  She told him that was her personal business and that what she had going on in her bedroom was her business.  (*Id.* at 27).

- When he saw Dee Dee, a female Koch Foods' employee with whom Curry was in a relationship, he told Curry she and Dee Dee could use some help in the bedroom and that "[he] bet [he] could eat [her] pussy better than Dee Dee." (*Id.* at 26-28).  During this encounter, he simulated oral sex with his tongue. (*Id.* at 45).  She asked him not to say that and to please stop talking to her like that. (*Id.* at 26).

---

essential to measure whether these words and this conduct could be read as having created 'an environment that a reasonable person would find hostile or abusive.'").
[4] Curry does not object to Koch Foods' statement of undisputed factS that she did not think these comments were inappropriate.  However, in response to Huddleston's statement of undisputed facts, Curry claims she testified she did think these comments were inappropriate.  (Doc. 50 at 7).  To the extent this is a disputed fact, it is immaterial.

- He told her she would rebuff him at first like a black female named Brenda but that she would "fold," stating he "turned [Brenda] out to the point where she came and knocked on [his] door,[] knowing [he] was married." (*Id.* at 27).

- He asked her why she was a lesbian several times and told her he had told his niece who was a lesbian that "it is absolutely nasty." (*Id.* at 28). Curry said, "[H]ow about we just don't even talk about it period." (*Id.*).

- He asked her whether she had any pictures and told her he could give her his e-mail address so that she could send pictures to him. (*Id.*). She told him she would not do that. (*Id.*).

- He told her a white Koch Foods' employee named Cindy had adopted one or more children and needed help and that he was going to help Cindy. (*Id.*) Later, he told her he was not going to help Cindy because Cindy "[was] not talking about opening her legs." (*Id.*).

- After Curry asked him why he continued to talk to her "like that," he told her that she, like Brenda, would "fold." (*Id.*).

Curry testified that between June 2015 and November 2015, Huddleston engaged in the following unwelcome conduct:

- After Curry told Huddleston that his wife was beautiful – Huddleston had shown a picture of his family to Curry – Huddleston said, "[N]ot as beautiful as you, I could just reach over there and bite that lip." (*Id.* at 28-29).

- In the process of reaching to get a piece of paper, he hit her breast with his arm while he was "looking dead at [her]," which led Curry to believe he did it on purpose. (*Id.* at 29).

Curry testified Huddleston made sexual comments to her all the time. (*Id.* at 27). She also testified that no matter what she talked about or did while working alongside Huddleston, "[H]e [went] back to sex. He [was] going to bring sex out of it." (*Id.* at 29).

### C. Curry's November 2015 Complaint

Koch Foods' Equal Employment Opportunity and Harassment Policy permits an employee to report harassment "by any [] person with whom the employee has contact as a result of their employment," orally or in writing, and designates a number of individuals for receiving harassment complaints, including a Shift Manager. (Doc. 46-2 at 78). Curry testified other USDA Inspectors told her the government "rules over Koch Foods" and advised her not to say anything about Huddleston's conduct because both she and Huddleston would probably be fired. (Doc. 45-1 at 33).

Nonetheless, in early November 2015, Curry spoke with her supervisor, Carolyn Richey, about Huddleston's behavior. (*Id.* at 29-31, 35-36). Curry told Richey that Huddleston was making sexual comments to her and sexually harassing her, she did not like talking about sex every day, and she did not want to work with Huddleston. (*Id.* at 29, 31, 35). Curry told Richey everything Huddleston had said to her and also told Richey that Huddleston had simulated oral sex. (*Id.* at 39, 46). Richey said she did not have any control over who the USDA

sent to work at the plant but that she would speak with the Night Shift Manager, Jeff Hawkins, about Huddleston's behavior and let Hawkins know Curry did not want to work with Huddleston because he was making her uncomfortable. (*Id.* at 31, 35). Richey did speak with Hawkins. (Doc. 45-7 at 16). Two or three days after Curry complained to Richey, Hawkins asked Curry to give him a few days to see what he could have done and told her that he would get back to her. (Doc. 45-1 at 31, 35-36).

### D. The "Book Incident"

After Curry complained to Richey in early November 2015, the "book incident" happened. (*Id.* at 30). Huddleston asked Curry whether she had seen the movie "Fifty Shades of Grey." (*Id.*). After Curry responded she had seen the movie, Huddleston asked her whether she liked it. (*Id.*). Curry responded "all it was about was sex." (*Id.*). Huddleston told Curry the book on which the movie was based was good and very interesting. (*Id.*). Curry said she did not need to read the book because she had seen the movie, but Huddleston insisted he give Curry the book to read, after which she could let him know what she thought about it. (*Id.*). Curry was not uncomfortable that Huddleston asked her to read the book. (*Id.* at 43). Huddleston brought the book to work on November 17, 2015. (*Id.* at 31, 36). Curry took the book, but she did not read it. (*Id.* at 31). Instead, Curry's mother saw the book in Curry's car and asked if she could read it. (*Id.*). Curry

asked Huddleston if her mother could read the book, and Huddleston said that was not a problem and to "take your time." (*Id.*).

Curry testified problems arose when she did not talk to Huddleston about the book:

> He would get absolute – he was like did you read this part where, you know, he is beating her pussy out, did you see that part where he was just – like he was just in control and he was just beating her out and – anyway. And then he said – I was like no, I didn't – I didn't get to that part, I haven't got to that part yet, didn't get to that part. It was like every day, it was like did you read this part, this part, this part, and I'm like no, I haven't got there yet. Got to the point where [Huddleston] would get on the stand and I would tell him my tooth was hurting so he wouldn't say nothing about the book.

(*Id.*). Huddleston then began asking when Curry was going to return the book. (*Id.*). Curry told Huddleston she would return the book after her mother finished reading it. (*Id.*). Curry did bring the book to work after her mother finished reading it, but she left the book in her car. (*Id.*). She told Huddleston she would give the book to the guard and he could get it from the guard when he came in the next morning. (*Id.*). On November 30, 2015, Huddleston told Curry he had checked with the guard and that Curry had not given the book to the guard. (*Id.* at 31, 60-61). He said, "If I don't have my book, then I'm going to knock your ass out." (*Id.*). On December 1, 2015, Huddleston came up the steps on Curry's side of the stand and said, "[I]f you don't have my book today, I'm going to shove my

dick so far up you it's going to come out your throat." (*Id.* at 32-33, 35). Curry pulled the book out from under her smock, shoved or slung the book toward Huddleston, who let it hit the ground, and loudly told Huddleston to "get out of [her] motherfucking face." (*Id.* at 32).

Curry testified that when Huddleston made one or both of these threats "[h]e was at [her] face," "was so mad and red," and was "really, really serious." (*Id.* at 34). She testified "[she] [couldn't] say that [she] thought he was going to [carry out one or more of the threats], but he might have – it had gotten to the point where they [were] still allowing him to still come out there, he could have done anything." (*Id.*). She also repeatedly testified later that she thought Huddleston was going to hurt her, noting she worked with a long, sharp knife that was not far from Huddleston. (*Id.* at 34, 65). Curry also generally wore steel-toed boots and a full-coverage, chainmail-type glove on her non-dominant hand when at work. (*Id.* at 64-65).

Curry testified Huddleston's actions brought back memories of a childhood trauma that involved her being molested by a man who drove her to preschool for two-and-a-half years because her mother did not have a car. (Doc. 45-1 at 59). The man stuck a rifle down her throat and told her he would "blow her brains out" if she told anyone. (*Id.*). She testified she continues to have flashbacks and nightmares every other week, both about her childhood trauma and Huddleston's

conduct.  (*Id.* at 58, 60).  She testified she started taking Tylenol PM to sleep in December 2015 after Huddleston threatened her.  (*Id.* at 58).

### E. Curry's December 1, 2015 Complaint & Koch Foods' Response

When Huddleston made his December 1, 2015 threat, Curry hit a button that called one of Huddleston's supervisors, USDA Supervisory Veterinarian Courtney Baldwin, to the production line.  (*Id.* at 32).  Curry told Dr. Baldwin what Huddleston had said, that he had threatened her, and that she was not going to work with him anymore.  (*Id.* at 32-33).

Also on that day, Curry made a written statement.  (*Id.* at 36-37).  In the statement, Curry wrote Huddleston had threatened her about returning the book. (Doc. 46-1 at 59).  She also wrote she had asked Huddleston whether the real reason he was upset was not the book, but rather because she asked another USDA Inspector not to let him on the stand because he was "disrespectful in a sexual way."  (*Id.*).  Additionally, she noted several specific sexual comments Huddleston had made to her, although not regarding the book.  (*Id.* at 59-60).  Hawkins shared Curry's statement with Dr. Baldwin the next day.  (Doc. 45-5 at 14).

Curry's statement was also delivered to Lisa Wright, Human Resources Manager at the Ashland plant.  (Doc. 45-6 at 29-30).  Wright shared the statement with Randy Cisne, Complex Human Resources Manager, with oversight of multiple Koch Foods' plants, including the Ashland plant.  (*Id.* at 30; Doc. 45-4 at

10-11).  At Cisne's direction, Wright interviewed Curry about the contents of the statement.  (Doc. 45-1 at 40-41; Doc. 45-3 at 10-11; Doc. 45-6 at 30).[5]  During the interview, Curry told Wright that Huddleston had threatened her about returning the book.  (Doc. 45-1 at 44).  During the same interview and a subsequent conversation that Wright indicated was off the record, Curry also told Wright about Huddleston's sexual comments.  (*Id.* at 40-43).  Wright believed Huddleston had sexually harassed Curry and relayed this determination to Cisne.  (Doc. 45-6 at 15, 41).  Based on the investigation conducted by Wright, Cisne also believed Huddleston had sexually harassed Curry.  (Doc. 45-4 at 15).

Koch Foods offered to move Curry from the evisceration department to another department within the plant, such as "live hanging" or the "cold side." (Doc. 45-1 at 51).  Curry declined the offer because she did not think she should have to change departments because of Huddleston's conduct.  (*Id.*).  Instead, Koch Foods arranged for someone to relieve Curry for the last thirty minutes of her shift if Huddleston came in early so that Curry would not have to interact with Huddleston.  (*Id.* at 51-53).  Initially, Koch Foods instructed Curry to sit in the break room until the end of her shift.  (*Id.* at 52).  Curry was nonetheless paid for her full shift.  (*Id.*).  At some point, Koch Foods moved Curry to a different line for

[5] Curry testified she met with Wright the evening after making her written statement.  (Doc. 45-1 at 39).  Wright testified she met with Curry for the first time on December 8, 2015, after receiving Curry's statement on December 7, 2015.  (Doc. 45-6 at 29-30).

the last thirty minutes of her shift. (*Id.*). Curry performed the same job and received the same pay on this other line. (*Id.*). However, she was embarrassed by having to leave her stand thirty minutes before the end of her shift. (*Id.* at 53). She testified that when she had to do so, it caused a lot of chaos; everybody looked at her and asked her questions; she had to sit in the break room "like [she] [was] the one [who] did something"; and that she was "completely absolutely run off the line." (*Id.* at 49).

Curry does not recall working with Huddleston again after December 1, 2015. (Doc. 45-1 at 49). Huddleston did make one additional comment to Curry after that date. (*Id.* at 53). One morning as Curry was leaving the line, she passed Huddleston as he was coming onto the line, and he loudly said, "[M]onkeys don't stop my show." (*Id.*).

**F. The USDA's Inquiry**

The USDA has a policy for handling complaints made by regulated industry establishments like Koch Foods against employees of the agency, referred to as Food Safety and Inspection Service Directive 4735.7 ("FSIS Directive 4735.7" or the "Directive"). (Doc. 46-1 at 116-120; Doc. 46-2 at 1-5). The Directive provides that an establishment may make a formal complaint, which is generally in writing and may require a formal inquiry and response, or an informal complaint, which is generally verbal and addressed at the local level. (Doc. 46-1 at 119; Doc.

46-2 at 1). After receiving a formal, written complaint, a supervisory official may conduct an inquiry and/or request that the Labor and Employee Relations Division of the USDA's Employee Relations Branch (the "LERD") conduct a formal investigation. (Doc. 45-3 at 9; Doc. 46-2 at 1-2). A supervisor may receive an informal, verbal complaint. (Doc. 46-2 at 1). The Directive advises, "Resolution at the lowest possible supervisory level is desirable and encouraged." (*Id.*). It provides an appeal process to the extent an establishment is not satisfied with the resolution of a complaint. (Doc. 45-3 at 42; Doc. 46-2 at 2-3).

Cisne believed the USDA would be looking into Curry's allegations against Huddleston after Curry's December 1, 2015 statement was shared with Dr. Baldwin. (Doc. 46-3 at 4). On January 13, 2016, Cisne and Wright met with James Jordan, a USDA Supervisory Veterinarian who directly supervised Huddleston, because Koch Foods had not received any communication from the USDA regarding the status of its investigation and Huddleston continued to work overtime, causing his and Curry's shifts to overlap. (Doc. 45-6 at 53; Doc. 46-1 at 51; 46-3 at 4). They presented the investigation file to Dr. Jordan. (Doc. 45-6 at 53; Doc. 46-1 at 51; 46-3 at 4). Dr. Jordan told Cisne and Wright he would provide the file to Dr. John Huie, a USDA Front Line Supervisor who conducts inquiries into USDA Inspectors. (Doc. 46-3 at 4). At that point, Dr. Huie commenced an inquiry into the allegations. (Doc. 45-3 at 15-16).

Cisne requested an update from Dr. Huie on February 9, 2016. Dr. Huie told Cisne the inquiry was being processed and would take some time to resolve. (Doc. 46-2 at 6). On March 21, 2016, Cisne notified Dr. Huie that Curry had filed an EEOC Charge, requested another update from Dr. Huie, and asked that the USDA ensure Huddleston was not working on Curry's line. (*Id.* at 19-20).

On March 23, 2016, Wright called Curry to check in and ask whether she had had any more problems. (Doc. 45-1 at 54). Curry told Wright people were asking a lot of questions regarding the matter with Huddleston and that she felt disrespected by Koch Foods and like she was not being taken seriously. (*Id.*; Doc. 46-2 at 9). She also told Wright about Huddleston's monkey comment. (Doc. 45-1 at 54; Doc. 46-2 at 9).

On March 24, 2016, Dr. Huie asked Koch Foods to speak with one of its employees named Andreal "Nikki" Cofield about whether a USDA employee had made inappropriate comments to her. (Doc. 46-2 at 19). Wright interviewed Cofield on March 25, 2016. (*Id.* at 10). Wright's interview notes indicate Cofield said Huddleston had made several sexual gestures and comments to her when she worked with him approximately two years prior; said Huddleston had made her feel very uncomfortable by staring at her while she was working and constantly hollering her name in an effort to get her attention; and recalled several specific things Huddleston had said to her and how they made her feel. (*Id.*). A written

statement Cofield made at the time of Wright's interview recounts an incident where Huddleston asked her why she was holding her shirt down to cover her bottom, she responded she was doing so in order that he couldn't see anything, and he replied, " ' Well I'm gonna stand here till you let it go where I can see what I want." (*Id.* at 11). Cofield told Wright she contemporaneously reported Huddleston's conduct to her supervisor and gave a statement to Jennifer McCollough,[6] then the Human Resources Manager at the Ashland plant. (*Id.* at 10). McCollough asked her whether she would consider transferring to a different department, and she accepted this offer. (*Id.*). In her March 25, 2016 statement, Cofield wrote that Huddleston gave her no more problems after the shirt incident. (*Id.* at 12). Wright submitted her interview notes and Cofield's later statement to Dr. Huie. (*Id.* at 19).

After interviewing Cofield, Wright found Cofield's May 2014 written statement. (Doc. 45-6 at 11-12). In the statement, Cofield recounted the incident where she pulled her shirt down to cover her bottom and further stated Huddleston had done other things, such as making obscene gestures mimicking the performance of sexual acts on her. (Doc. 46-2 at 13). Koch Foods never provided this written statement to the USDA. (Doc. 45-4 at 20).

---

[6] Although Wright's interview notes identify the Human Resources Manager as Jennifer Mitchell (Doc. 46-2 at 10), McCollough's last name was Mattox during the time she worked at the Ashland plant (Doc. 46-4 at 2). McCollough voluntarily resigned from her position at the Ashland plant in February 2015. (*Id.*).

McCollough has submitted an affidavit dated June 2018, in which she testifies she offered Cofield another position because she was not permitted to direct Huddleston, a USDA employee, and verbally reported Cofield's allegations to a USDA Supervisory Veterinarian who was filling in for Dr. Jordan, Huddleston's regular supervisor. (Doc. 46-4 at 3). She further testifies she does not remember the supervisor's name, although she recalls it was an African American man with an accent. (*Id.*). Finally, she testifies she does not know what, if anything, the USDA did with the information she reported but that she is not aware of any additional issues Cofield had with Huddleston or any other complaints made against Huddleston by Koch Foods' employees. (*Id.*).

According to Wright, McCollough should have reported the information she learned from Cofield regarding Huddleston's conduct to Cisne, who should have then reported the information to the USDA. (Doc. 45-6 at 35-36). Cisne also testified that McCollough should have reported Cofield's complaint to him. (Doc. 45-4 at 7). McCollough did not report the complaint to Cisne. (*Id.*).

Dr. Huie testified he did not learn of Cofield's allegations against Huddleston until he was conducting the inquiry regarding Curry's allegations. (Doc. 45-3 at 7, 38, 57-59). He further testified he would have performed an inquiry had he received Cofield's written statement in 2014. (*Id.* at 12). Although he initially testified there would be a written record if McCollough had informed

Huddleston's supervisor of Cofield's complaint, he later testified it was possible for a USDA supervisor to receive a verbal complaint and resolve the issue without escalating it to him, in which case there would not be a written record. (*Id.* at 59). He also testified a USDA supervisor would have spoken with Huddleston about any complaint received about him harassing Cofield. (*Id.*). Huddleston testified no one ever spoke with him about Cofield's complaint. (Doc. 45-2 at 38).

After completing his inquiry, Dr. Huie requested through his district manager on March 31, 2016, that the LERD conduct a formal investigation of Huddleston. (Doc. 45-3 at 66-67; Doc. 46-1 at 53-54). On April 11, 2016, Cisne notified Dr. Huie that according to Curry, Huddleston continued to talk about the case, which Curry felt was in retaliation for her filing a complaint. (Doc. 46-2 at 21). Cisne officially requested that Huddleston be moved from Curry's line. (*Id.*). Ultimately, the USDA's LERD chose not to conduct a formal investigation but did issue Huddleston a Letter of Caution on April 25, 2016. (Doc. 45-3 at 68; Doc. 46-1 at 67-68). Huddleston took a leave of absence from work for medical reasons between mid-April and late-May 2016. He signed to acknowledge receipt of the Letter of Caution the day after his return to work on May 23, 2016. (Doc. 46-1 at 68, 101). On his return, Huddleston worked on a different line from the one on which Curry worked. (*Id.* at 101). Curry left Koch Foods to take a position with another employer during the first week of June 2016. (Doc. 45-1 at 14-15).

## II. STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he [district] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the record the party believes demonstrate the absence of a genuine dispute as to a material fact. *Celotex Corp.*, 477 U.S. at 323. If the moving party carries its initial burden, the non-movant must go beyond the pleadings and come forward with evidence showing there is a genuine dispute as to a material fact for trial. *Id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* at 248. If the evidence is merely colorable or not significantly probative, summary judgment is appropriate. *Id.* at 249-50 (internal citations omitted). All reasonable doubts about the facts should be resolved in favor of the non-movant, and all justifiable inferences should be drawn in the non-movant's favor. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III. DISCUSSION

### A. "Hostile Work Environment" Sexual Harassment

Title VII prohibits "hostile work environment" sexual harassment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To establish a prima facie case of "hostile work environment" sexual harassment, a plaintiff must show (1) she belongs to a protected group; (2) she has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, or other conduct of a sexual nature; (3) the harassment was based on her sex; (4) the harassment "was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;" and (5) a basis for holding the employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999). Koch Foods rests its summary judgment motion as to Curry's "hostile work environment" sexual harassment claim on the second, fourth, and fifth elements.

### 1. Unwelcome Sexual Harassment

Koch Foods characterizes the book incident as a disagreement regarding the return of the book that ended in a yelling match, not unwelcome sexual harassment. (Doc. 44 at 26, 30 n.4, 31; Doc. 52 at 14-18).[7] To support this

---

[7] Koch Foods makes this characterization in the context of its arguments on the fourth and fifth elements of Curry's "hostile work environment" sexual harassment claim. (Doc. 44 at 26, 30

characterization, Koch Foods (1) cites Curry's testimony she knew the book contained sexual content because she had seen the movie; was not uncomfortable when Huddleston asked her to read the book; and gave the book to her mother to read;[8] (2) emphasizes Curry's testimony that Huddleston conditioned each threat on her failure to return the book; she told Wright that Huddleston had made threats regarding the return of the book; and she told Dr. Baldwin that Huddleston had threatened her, not that he had made sexual comments to her about the book; and (3) notes Curry's written statement does not mention sexual comments Huddleston made to her regarding the book but, rather, states Huddleston made threats regarding the return of the book. (Doc. 52 at 14-18). Notwithstanding this evidence, there is testimony that would allow a reasonable jury to conclude the book incident as a whole constituted unwelcome conduct of a sexual nature.

Curry testified Huddleston repeatedly attempted to discuss the book with her. (Doc. 45-1 at 31). Her testimony indicates she viewed the book as "[just] about sex" and that in trying to initiate one conversation about the book,

---

n.4, 31; Doc. 52 at 14-18). Because the characterization goes to the second element of the claim – whether Curry was subject to unwelcome sexual harassment – the undersigned addresses it as a stand-alone argument.

[8] Based on this testimony, Koch Foods argues with respect to the book incident that Curry cannot satisfy the subjective prong of the severe-and-pervasive test. (Doc. 52 at 14-15). That test is discussed in greater detail below. Here, it is sufficient to note a court considers the conduct complained of collectively when analyzing the fourth element of a "hostile work environment" sexual harassment claim, *Mendoza*, 195 F.3d at 1246, and the book incident is only one instance of conduct Curry claims was harassing. For this reason, Koch Foods' argument Curry did not subjectively perceive the book incident as sufficiently severe or pervasive is more properly considered an argument the incident was not one of unwelcome sexual harassment.

Huddleston asked Curry whether she had read the part where "he is beating her pussy out" and "he was just in control and [] was just beating her out []." (*Id.*). Based on this testimony, a reasonable jury could conclude Huddleston's conduct surrounding the book was sexual in nature. *Cf. Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) (holding repetitive solicitude; invitation to dine at a Hooters restaurant, unaccompanied by any sexual remark or pressure when declined; and invitation to be part of a group dinner at a bar was not sexually harassing behavior), *overruled on other grounds as recognized by Byrd v. Postmaster General*, 582 F. App'x 787, 790 (11th Cir. 2014).

Curry also testified she repeatedly deflected Huddleston's attempts to discuss the book with her. (Doc. 45-1 at 31). Based on this testimony, a reasonable jury could conclude that even if Curry did not find Huddleston's request that she read the book offensive or find the book so offensive that she rebuffed her mother's request to read the book, she did not want to discuss the book with Huddleston and found his repeated attempts to initiate discussions about the book uncomfortable. *See Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982) (noting conduct is unwelcome if the employee did not solicit or incite it and regards it as undesirable or offensive).

This same testimony supports a reasonable inference Huddleston demanded Curry return the book *because* he was frustrated she continued to deflect his

attempts to initiate sexually explicit conversations about the book and, therefore, that the true precipitating force for these threats was this frustration. This inference is bolstered by Curry's testimony that problems arose when she did not talk to Huddleston about the book (Doc. 45-1 at 31) and by the portion of her written statement noting she asked him whether the real reason he was upset was because she had asked the third-shift USDA Inspector not to let him on the stand early because he was "disrespectful in a sexual way" (Doc. 46-1 at 59).

Finally, regardless of the conduct preceding the final book incident threat or what precipitated that threat, it would be difficult to reach any conclusion other than that the threat itself constituted unwelcome conduct of a sexual nature. Curry testified Huddleston stepped up onto her stand, got in her face, appeared mad and serious, and threatened to "shove [his] dick so far up [her] [it would] come out [her] throat." (*Id.* at 32, 34, 35). A reasonable jury could interpret this threat as one of graphic sexual violence made while encroaching on the personal space of its recipient in an aggressive manner. Viewed as such, it is self-evident the threat would constitute unwelcome conduct of a sexual nature. Further, Curry's testimony regarding the psychological effects of Huddleston's conduct supports this conclusion. (Doc. 45-1 at 58-60).

Because Curry has produced sufficient evidence for a reasonable jury to conclude the book incident as a whole constituted unwelcome conduct of a sexual

nature, the incident may be considered part of her "hostile work environment" sexual harassment claim.

## 2. Sufficiently Severe or Pervasive Harassment

The fourth element of a "hostile work environment" sexual harassment claim has a subjective and an objective component. *Mendoza*, 195 F.3d at 1246. The employee must subjectively perceive the harassment as severe or pervasive enough to alter the terms and conditions of her employment and create a discriminatorily abusive work environment, and her subjective perception must be objectively reasonable. *Id.* An employee's subjective perception is objectively reasonable if a reasonable person in her position would consider the harassment hostile or abusive, considering all of the circumstances. *Id.* Factors relevant to the objective component include (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating or, rather, a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.* A court must consider the conduct complained of collectively and determine whether a sexually hostile work environment is demonstrated by a totality of the circumstances. *Id.* These standards are designed to ensure Title VII does not become a " 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Properly

applied, they exclude offhand comments, isolated incidents (unless extremely serious), and the "sporadic use of abusive language" from actionable conduct. *Faragher*, 524 U.S. at 788 (internal quotation marks omitted).

Koch Foods argues Curry's delay in reporting harassment she alleges began in September 2014 undermines her claim she subjectively perceived the harassment as severe or pervasive. (Doc. 52 at 13). However, Curry testified other USDA Inspectors told her the government "rules over Koch Foods" and advised her not to saying anything about Huddleston's conduct because both she and Huddleston would probably be fired. (Doc. 45-1 at 33). Under similar circumstances, an Alabama federal district court declined to impute the suggestion that the conduct was not sufficiently severe or pervasive to a plaintiff. *See Splunge v. Shoney's, Inc.*, 874 F. Supp. 1258, 1274-75 (M.D. Ala. 1994) (plaintiff's failure to report alleged harassment was coupled with fear of retaliatory termination and an unawareness of employer's internal grievance procedure).

With respect to the fourth element's objective component, Koch Foods argues the comments Huddleston made to Curry were "one-off," isolated remarks spread out over a period of time, as opposed to daily, repeated occurrences, and that the threats were two, isolated incidents. (Doc. 44 at 25-26). First, notwithstanding the number of specific comments to which Curry testified, Curry testified generally that Huddleston made sexual comments to her all the time; that

no matter what she talked about or did while working alongside Huddleston, he turned it into a conversation about sex; and that she told Richey she did not like talking about sex every day. (Doc. 45-1 at 29, 31). This testimony would allow a reasonable jury to conclude Curry was subject to frequent, unwelcome conduct of a sexual nature by Huddleston. *See Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 418, 418, n.1 (11th Cir. 1999) (noting plaintiff was subject to continuous barrage of sexual harassment and that although first specific incident she could recall occurred in 1993, she stated numerous incidents occurred before then).

Second, the frequency of the harassment is only one consideration relevant to determining whether it was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. *See Mendoza*, 195 F.3d at 1246. Also relevant is whether the harassment was physically threatening. *See id.* Moreover, frequency is measured not just by considering the total number of incidents over the entire period in question, but also by considering the rate at which those incidents occurred. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1303-04 (11th Cir. 2012). In *Jones*, seven incidents of racists acts over a year, four of which occurred within a two-week period near the end of the plaintiff's employment and one of which was a possibly threatening confrontation, created a jury question as to whether the

plaintiff endured a racially hostile work environment. *Id.* (holding the increasing frequency and seriousness of the harassment represented an escalation of incidents making the issue one for the trier of fact).

Curry has identified at least eight unwelcome comments of a sexual nature Huddleston made to her over approximately fourteen months, at least one of which was accompanied by an overtly sexual gesture. (Doc. 45-1 at 26-29, 45, 57). She also identified one incident of unwelcome touching that occurred during that time. (*Id.* at 29). On the heels of the unwelcome sexual comments and touching, Huddleston initiated an incident that involved him repeatedly attempting to discuss the sexual content of a book with Curry during an approximately two-week period. (*Id.* at 31). That incident culminated in two threats of physical violence which a reasonable jury could determine was precipitated by Huddleston's frustration Curry would not discuss the sexual content of the book with him. (*Id.* at 31-32). Both threats were made in proximity to a knife. (*Id.* at 34). One was graphic and sexual in nature, and Huddleston's physical demeanor and encroachment on Curry's personal and professional space when making it served to intensify the threat. (*Id.*). On these facts, a reasonable jury could conclude Curry endured

sexual harassment severe or pervasive enough to alter the terms and conditions of her employment and create a discriminatorily abusive work environment.[9]

Koch Foods also argues Huddleston's comments did not adversely affect Curry's work performance because after making her complaint she remained on the same shift, in the same position, performing the same work; never worked with, or was subjected to sexual comments from, Huddleston again; did not receive a negative performance review or any disciplinary action; and remained at Koch Foods until she secured other employment. (Doc. 44 at 26-29). First, this argument focuses on the conditions of Curry's employment after her complaint on December 1, 2015, effectively put an end to Huddleston's conduct. The proper focus of the inquiry is whether the conduct complained of unreasonably interferes with the plaintiff's job performance while that conduct is occurring. *See, e.g.,* *Lockett v. Choice Hotels Int'l, Inc.*, 315 F. App'x 862, 866-67 (11th Cir. 2009) (in

---

[9] Koch Foods cites a number of cases, claiming those courts found conduct more egregious than Huddleston's insufficient to support a "hostile work environment" sexual harassment claim. (Doc. 44 at 24, 24 n.1, 25 n.2). These cases are distinguishable by the absence of physically threating conduct alleged by the plaintiffs. *See Mendoza*, 195 F.3d at 1248 (noting absence of physically threatening conduct); *Gupta*, 212 at 586 (same); *Webb-Edwards v. Orange Cnty Sheriff's Office*, 525 F.3d 1013, 1027 (11th Cir. 2008) (same); *Shepherd v. Comptroller of Pub. Accounts of State of Texas*, 168 F.3d 871, 874 (5th Cir. 1999) (same); *Sraver v. Surgical Monitoring Servs., Inc.*, 2006 WL 2190727, at *5 (D. Md. July 27, 2006) (same); *Miller v. Lectra USA, Inc.*, 145 F. App'x 315, 317 (11th Cir. 2005) (no allegation of physically threatening conduct); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.3d 333, 334-35 (7th Cir. 1993) (same); *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 935 (8th Cir. 2002) (same); *Howard v. City of Robertsdale*, 168 F. App'x 883, 889 (11th Cir. 2006) (holding sexual comments and jokes could not serve as basis for constructive knowledge of harassment). The Eleventh Circuit has noted that whether the conduct complained of was physically threatening is an important factor in the hostile work environment analysis. *See Jones*, 683 F.3d at 1303.

holding there was no evidence conduct complained of unreasonably interfered with employee's work performance, court noted plaintiff received at least one pay raise during the time that conduct occurred).

More to the point, [t]he Supreme Court has cautioned that harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1277 (11th Cir. 2012) (citing *Harris*, 510 U.S. at 22 ("[E]ven without regard to [] tangible effects [on job performance], the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.")); *see also Lockett*, 315 F. App'x at 867 (noting a Title VII violation does not require that plaintiff's job performance be tangibly affected). Whether the conduct complained of unreasonably interferes with the plaintiff's job performance is one factor relevant to determining whether the conduct was sufficiently severe or pervasive, and the Eleventh Circuit employs a totality-of-the-circumstances approach to the determination. *Miller*, 277 F.3d at 1276 (noting the defendant lost sight of this approach in focusing on the single factor of unreasonable interference with job performance). Given Curry has produced evidence of frequent, unwelcome conduct of a sexual nature that escalated to serious threats of physical violence, any absence of evidence

Huddleston's conduct unreasonably interfered with Curry's job performance is not fatal to Curry's claim. *See id.* at 1266-67 (holding plaintiff's failure to convincingly establish how harasser's conduct interfered with his duties was not fatal to his racially hostile work environment claim, given plaintiff established the conduct was frequent, severe, and humiliating).

### 3. Basis for Liability

An employer may incur Title VII liability even if the alleged harasser is a third party, such as an employee or customer. *Beckford v. Dep't of Corr.*, 605 F.3d 951, 957 (11th Cir. 2010) (describing this liability as well-established). Under such circumstances, a plaintiff must demonstrate the fifth element of a "hostile work environment" sexual harassment claim by showing the employer had actual or constructive notice of the harassment and failed to take sufficient corrective action. *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003). Actual notice is established by proof management knew about the harassment. *Watson*, 324 F.3d at 1259. For example, actual notice is established where an employee shows she complained to management, *Henson*, 682 F.2d at 905, or that her employer had a clear, published policy setting forth the procedure for reporting harassment and she followed that procedure, *Watson*, 324 F.3d at 1259. Constructive notice is established where harassment was so severe and pervasive that management reasonably should have known about it. *Id.*

An employer is not liable for harassment of which it had actual or constructive notice provided it took sufficient corrective action. *See Watson*, 324 F.3d at 1261 (describing the response required as "immediate and appropriate" corrective action"); *Wilcox v. Corr. Corp. of Am.*, 892 F.3d 1283, 1287-88 (11th Cir. 2018) (describing the response required as "prompt" corrective action); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002) (same); *Henson*, 682 F.2d at 905 (same). The corrective action must be reasonably likely to prevent the harassment from recurring. *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996). The adequacy of the corrective action must be determined on a case-by-case basis. *Johnson v. Austal, U.S.A., L.L.C.*, 805 F. Supp. 2d 1299, 1317 (S.D. Ala. 2011).

Koch Foods argues it took sufficient corrective action by separating Curry from Huddleston after the book incident threat on December 1, 2015, and reporting Curry's allegations against Huddleston to the USDA. (Doc. 44 at 29-33). In response, Curry does not challenge the adequacy of the corrective action Koch Foods took after her December 1, 2015 complaint.[10] She argues Koch Foods

---

[10] This action was sufficient both in promptness and substance. Koch Foods immediately took steps to ensure Curry never worked with Huddleston again. (Doc. 45-1 at 49, 51-53). *See Fleming v. Boeing Co.*, 120 F.3d 242, 244, 247-48 (11th Cir. 1997) (holding employer took sufficient corrective action where, *inter alia*, it transferred harassed employee to different work group in same facility). It commenced its own investigation of Curry's complaint within one week and within approximately six weeks took steps to ensure the USDA undertook a review of the complaint. (Doc. 45-1 at 39; Doc. 45-6 at 29-30, 53; Doc. 46-1 at 51; Doc. 46-3 at 4). *See*

should have (1) prevented the harassment from occurring in the first place by responding differently to Cofield's complaint against Huddleston in May 2014, or at least (2) taken some action after she reported Huddleston's conduct to Richey in early November 2015. (Doc. 50 at 30-38).

### a. Adequacy of Response to Cofield's May 2014 Complaint

Courts have held that under certain circumstances, an employer may be obligated to take adequate measures to try to prevent an employee's harassment, not merely to act after the harassment has occurred. In what has been described as the leading case on this theory of liability, the Fourth Circuit held an employer may be liable for "hostile work environment" sexual harassment if it anticipated or reasonably should have anticipated the plaintiff would be sexually harassed and failed to take action reasonably calculated to prevent the harassment. *Paroline v. Unisys Corp.*, 879 F. 2d 100, 107 (4th Cir. 1989), *opinion vacated in part on other grounds*, 900 F.2d 27 (4th Cir. 1990); *see also Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 255 (4th Cir. 2015) (reaffirming the holding of *Paroline*); *Donaldson v. Lensbouer*, 2017 WL 2199006, at *10 (W.D. Pa. May 18,

---

*Wilcox*, 892 F.3d at 1288 (rejecting plaintiff's argument six weeks between her complaint and her interview by an investigator was too long where the investigation had a lot of moving parts). Curry experienced only one additional instance of unwelcome conduct from Huddleston. (Doc. 45-1 at 53). *See Wilcox*, 892 F.3d at 1288 (evaluating effectiveness of corrective action in determining employer's Title VII liability); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317-18 (11th Cir. 1989) (affirming district court's holding plaintiffs were not constructively discharged, where, *inter alia*, plaintiffs alleged only one additional incident of harassment occurred after reprimand)

2017) (describing *Paroline* as the leading decision on this theory of liability); *Hirase-Doi v. U.S. West Commc'ns, Inc.*, 61 F.3d 777, 784 (10th Cir. 1995) (citing *Paroline* for the theory of liability in general), *abrogated on other grounds by Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998), *and Faragher*, 524 U.S. 775; *Munn v. Mayor and Aldermen of City of Savannah, Georgia*, 906 F. Supp. 1577, 1584 (S.D. Ga. 1995) (citing *Paroline* and *Hirase-Doi* for the theory of liability in general); *Longstreet v. Illinois Dep't of Corr.*, 276 F.3d 379, 382-83 (7th Cir. 2002) (espousing similar theory of liability); *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136-37 (2d Cir. 2001) (same). In so holding, the Fourth Circuit noted an employer's knowledge an employee has previously harassed employees other than the plaintiff "will often prove highly relevant" in determining whether the employer anticipated or should have anticipated the plaintiff would be harassed. *Paroline*, 879 F.2d at 107.

Whether Cofield's May 2014 allegations against Huddleston are sufficient to have put Koch Foods on notice Huddleston had a tendency to sexually harass female Inspector Helpers, Koch Foods' response to the allegations was reasonably calculated to prevent future harassment by Huddleston. The Eleventh Circuit has held transferring a harassed employee to a different work group in the same facility and issuing a verbal warning to the harasser constitutes sufficient corrective action in response to substantiated allegations of unwelcome conduct similar to those

made by Cofield against Huddleston. *See Fleming v. Boeing Co.*, 120 F.3d 242, 244, 247-48 (11th Cir. 1997) (male employee touched female employee in an unwelcome manner, leered at her, and made inappropriate comments to her).

McCollough's response to Cofield's complaint is substantially similar to the corrective action the Eleventh Circuit held sufficient in *Fleming*. McCollough offered to transfer Cofield to a different department, and Cofield accepted the offer. (Doc. 46-2 at 10). She could not address Huddleston because he was a USDA employee, but she did verbally report Cofield's complaint to a USDA Supervisory Veterinarian with authority over Huddleston. (Doc. 46-4 at 3). Although she did not learn what came of her verbal report to Huddleston's supervisor, she was not aware of any additional issues Cofield had with Huddleston. (*Id.*). In her March 2016 statement, Cofield confirmed she did not have any more problems with Huddleston. (Doc. 46-2 at 12-13). McCollough was not aware of any other complaints made against Huddleston by Koch Foods' employees, either. (Doc. 46-4 at 3). On these facts, it would have been reasonable for McCollough to believe her verbal report to Huddleston's supervisor was sufficient to invoke some action against, or at least questioning of, Huddleston regarding Cofield's complaint. Because McCollough transferred Cofield away from Huddleston and took action reasonably designed to ensure Cofield's

complaint was addressed with Huddleston, the Eleventh Circuit's holding in *Fleming* logically extends to the circumstances here.

Curry disputes that McCollough verbally reported Cofield's complaint to Huddleston's supervisor on the ground McCollough cannot remember more specifics regarding that person's identity. (Doc. 59 at 6, 33 n.6). That McCollough cannot recall the name of the supervisor, whom she described as an "African American man [with] an accent" and explained was not Huddleston's regular supervisor (Doc. 46-4 at 3), years later does not create a genuine issue as to whether McCollough verbally reported Cofield's complaint. Curry also claims the USDA disputes that McCollough verbally reported Cofield's complaint to Huddleston's supervisor. (*Id.*). To support her claim, she cites Dr. Huie's deposition testimony that if McCollough had informed Huddleston's supervisor of Cofield's complaint there would be a written record. (Doc. 45-3 at 59). However, Dr. Huie clarified this testimony by explaining he would have received any written complaint, but that it was possible for a USDA supervisor to receive a verbal complaint and resolve the issue without escalating it to him. (*Id.*). Dr. Huie also testified a USDA supervisor would have spoken with Huddleston about any complaint received about him harassing Cofield (Doc. 45-3 at 59), and Huddleston testified no one ever spoke with him about Cofield's complaint (Doc. 45-2 at 38). This may allow the inference the USDA did not act on McCollough's verbal

report, but it is insufficient to create a genuine factual dispute as to whether McCollough made the verbal report.

Whatever action McCollough took in response to Cofield's complaint, Curry argues more could and should have been done: Curry claims McCollough had an obligation to report Cofield's complaint up the chain of command within Koch Foods, should have investigated Cofield's complaint, and should have lodged a written complaint with the USDA to trigger an agency review under FSIS Directive 4735.7, and that Koch Foods could have appealed any unsatisfactory outcome of an agency review under the Directive or sought an injunction from a federal court prohibiting Huddleston from working as a USDA Inspector at the Ashland plant. (Doc. 50 at 32-34).

Although Wright and Cisne did testify McCollough should have reported Cofield's complaint to Cisne (Doc. 45-4 at 7; Doc. 45-6 at 35-36), McCollough's failure to escalate the complaint to her superior is insufficient to create a genuine issue as to whether the action she did take in response to the complaint was reasonably calculated to prevent further harassment by Huddleston.

FSIS Directive 4735.7 expressly contemplates that an establishment such as Koch Foods may make a verbal complaint regarding an agency employee to that employee's supervisor for resolution at the local level. (Doc. 46-1 at 119; Doc. 46-2 at 1). In fact, the Directive advises "[r]esolution at the lowest possible

supervisory level is desirable and encouraged." (Doc. 46-2 at 1). Notwithstanding the plain language of the Directive, Curry claims Dr. Huie testified a complaint against a USDA Inspector had to be in writing and given to the USDA. (Doc. 50 at 33). This was Dr. Huie's initial testimony. (Doc. 45-3 at 28). However, as discussed above, Dr. Huie later in his deposition clarified it was possible for a USDA supervisor to receive a verbal complaint about an agency employee and resolve that complaint at the local level. (*Id.* at 59). This testimony is consistent with the plain language of the Directive.

Curry cites *FPL Food, LLC v. U.S. Dep't of Agric.*, 671 F. Supp. 2d 1339 (S.D. Ga. 2009), to support her claim Koch Foods could have exhausted its administrative remedies under the Directive or sought an injunction from a federal court prohibiting Huddleston from working as a USDA Inspector at the Ashland plant. (Doc. 50 at 33-35). That case involved a variety of claims brought by a beef processing plant against the USDA and one of its inspectors based on allegations the inspector sexually harassed and retaliated against the plant's employees. *FPL Food*, 671 F. Supp. 2d at 1342. In dismissing the processor's claim for a declaration the inspector's continued harassment of the processor's employees would subject the processor to Title VII liability, the court held the processor did not legitimately face that liability because its exhaustion of administrative remedies under FSIS Directive 4735.7 and vigorous prosecution of a complex

lawsuit to remove the inspector from its premises constituted "much more forceful" corrective action than what the Eleventh Circuit has held sufficient. *Id.* at 1356. Although *FPL Food* may provide examples of actions an employer may attempt to take in response to allegations a government inspector has harassed its employee, it does not stand for the proposition an employer must take those actions to satisfy the requirements of Title VII.[11]

Ultimately, the flaw in Curry's argument that McCollough and Koch Foods could and should have done more in response to Cofield's complaint is that the availability of different, additional, or more aggressive corrective actions does not demonstrate the response was unreasonable for purposes of imposing Title VII liability on Koch Foods for Huddleston's later harassment of Curry. Title VII does not require an employer to take the most effective action to avoid liability. *Fuller*

---

[11] In reply to Curry's citation to *FPL Foods*, Koch Foods notes the court in that case dismissed the processor's claim for a declaratory judgment on the additional ground the processor's relationship the inspector was probably too remote to subject it to liability for the inspector's acts. (Doc. 52 at 24-27). To the extent Koch Foods attempts to argue there are no circumstances under which it could incur Title VII liability for Huddleston's harassment of Curry by virtue of the nature of its relationship with the USDA, the undersigned rejects that argument for two reasons. First, Koch Foods did not raise the argument in its initial brief, which focused on the action Koch Foods took following Curry's December 1, 2015 complaint. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (noting the Eleventh Circuit has repeatedly admonished that arguments raised for the first time in a reply brief are not properly before a reviewing court). Second, Koch Foods has failed to submit evidence sufficient to allow a determination of the remoteness of its relationship with Huddleston. *See FPL Foods*, 671 F. Supp. 2d at 1356-57 (finding processor's relationship with inspector was involuntary and disadvantageous where complaint's allegations demonstrated processor could not avoid inspector if it wanted to conduct its business lawfully, inspector's misconduct caused processor economic harm, and processor preferred to have different inspector stationed at plant).

*v. Caterpillar, Inc.*, 124 F. Supp. 2d 610, 617 (N.D. Ill. 2000); *see also Zupan v. State of Illinois*, 1999 WL 281344, at *5 (N.D. Ill. Mar. 30, 1999) (for this reason, rejecting employee's argument that "immediate and appropriate corrective action" standard required employer to transfer alleged harasser out of building where employee worked); *cf. Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1306 (11th Cir. 2007) (noting "[a sexual harassment] complainant does not get to choose the remedy"). It requires an employer to take action reasonably likely to prevent a recurrence of the harassment. *See., e.g.*, *Kilgore*, 93 F.3d at 754; *Paroline*, 879 F. 2d at 107. With respect to Cofield's complaint against Huddleston, Koch Foods did.

Finally, the fact that Huddleston later harassed Curry does not necessarily render the response to Cofield's earlier complaint against Huddleston unreasonable. *See Baldwin*, 480 F.3d at 1305 (noting it is enough if the corrective action is reasonably likely to prevent the harassment from recurring because "with human beings there are no guarantees"). The Seventh Circuit's decision in *Longstreet* is instructive on this point. In that case, the plaintiff argued she would not have become the victim of a co-worker's harassment if her employer had responded more vigorously to a prior incident where the co-worker had offered another co-worker $100 to " 'suck his dick'" and $200 to have sex with him. *Longstreet*, 276 F.3d at 382-83. The court rejected this argument after finding that

the employer's response to the prior incident – reassignment of the harasser, which resolved the harassed co-worker's problems with him – was reasonable. *Id.* The court reasoned "[i]t would push the role of deterrence too far to say that a response which seemed to be within the realm of reasonableness in one situation can, if ultimately it did not have the proper deterrent effect, be the sole basis for liability in another case . . . ." *Id.* at 382. Curry essentially makes the same argument as the plaintiff in *Longstreet*, and this argument fails for the reasons articulated by the court in that case. *See also Stancombe v. New Process Steel LP*, 652 F. App'x 729, 736-37 (11th Cir. 2016) (holding there was no basis for imposing liability on employer for employee's conduct where, *inter alia*, plaintiff did not show employer had failed to respond appropriately to prior complaints against employee).

For the foregoing reasons, Koch Foods' response to Cofield's May 2014 complaint against Huddleston is not a basis for imposing liability on Koch Foods for Huddleston's subsequent harassment of Curry.

### b. Failure to Take Action on November 2015 Complaint

Curry also identifies Koch Foods' response to her November 2015 complaint as a basis for holding it liable for Huddleston's harassment. (Doc. 50 at 35-38). She argues Koch Foods had actual notice of the harassment in early November 2015 but did nothing, allowing it to escalate into the threatening

confrontation in which the book incident culminated. (*Id.*). There is evidence that would allow a reasonable jury to conclude likewise.

In early November 2015, Curry told Richey that Huddleston was making sexual comments to her and sexually harassing her and she did not want to work with him. (Doc. 45-1 at 29, 31, 35). Curry told Richey everything Huddleston had said to her and also told Richey that Huddleston had simulated oral sex. (*Id.* at 39, 46). Richey spoke with Hawkins about Curry's complaint. (Doc. 45-7 at 16).[12] Koch Foods' Equal Employment Opportunity and Harassment Policy permits an employee to report harassment by "any [] person with whom the employee has contact as a result of their employment," orally or in writing, and designates a number of individuals for receiving harassment complaints, including a Shift Manager. (Doc. 46-2 at 78). A reasonable jury could conclude Curry's report to Hawkins through Richey substantially complied with Koch Foods' procedure for reporting harassment and put Koch Foods on actual notice of Huddleston's sexual harassment. *See Henson*, 682 F.2d at 905 (noting actual notice is established where employee shows she complained to management); *Watson*, 324 F.3d at 1259

---

[12] In a footnote, Koch Foods summarily states it disputes Curry told Richey or Hawkins before December 1, 2015, that Huddleston was sexually harassing her. (Doc. 44 at 30 n.4). However, Koch Foods does not dispute the evidence Curry offered regarding the substance or timing of her report to Richey or whether Richey relayed the report to Hawkins. (Doc. 50 at 13-14; Doc. 52 at 7). Moreover, Koch Foods acknowledges this evidence must be viewed in the light most favorable to Curry at this stage of the litigation. (Doc. 44 at 30 n.4).

(noting actual notice is established where plaintiff followed employer's clear, published policy for reporting harassment).[13]

Two or three days after Curry complained to Richey, Hawkins asked Curry to give him a few days to see what he could have done and told her that he would get back to her. (Doc. 45-1 at 31, 35-36). However, neither he nor anyone else took any action on Curry's November 2015 complaint. A reasonable jury could find that Koch Foods should have ensured Curry did not work on the same stand as Huddleston immediately after she made her November 2015 complaint, as it did in response to her December 1, 2015 complaint, thereby preventing the book incident, which was arguably Huddleston's most egregious conduct. *See, e.g., Williamson v. City of Houston, Texas*, 148 F.3d 462, 465-67 (5th Cir. 1998) (rejecting employer's argument it did not have notice plaintiff was being sexually harassed until she filed formal complaint and took prompt remedial action at that time, where employer had notice of the harassment prior to that complaint); *Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1110 (8th Cir. 1998) (holding reasonable jury could have found employer failed to take appropriate steps to remedy sexual harassment, where plaintiff complained to supervisor about co-worker's harassment and supervisor reported those complaints to management, but no action was taken until

---

[13] Koch Foods does not argue Curry's November 2015 report to Richey was not substantively or procedurally sufficient to put Koch Foods on actual notice Huddleston was sexually harassing Curry.

after incident described as proverbial "last straw" occurred months later); *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 841 (8th Cir. 1998) (holding reasonable jury could have found employer failed to put a stop to sexual harassment promptly, where plaintiff had complained to manager about harassment long before incident that resulted in manager taking action against harasser).

In sum, Curry has submitted evidence that would allow a reasonable jury to conclude she was subject to sexual harassment sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment and that Koch Foods failed to take sufficient corrective action after receiving actual notice of the harassment in November 2015. Therefore, Koch Foods' motion for summary judgment on Curry's "hostile work environment" sexual harassment claim is due to be denied.

### B. Retaliation

Title VII and § 1981 both prohibit discriminatory retaliation. *See Barnett v. Athens Reg'l Med. Ctr., Inc.*, 550 F. App'x 711, 713-14 (11th Cir. 2013).[14] Absent direct evidence of retaliation, courts use the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze retaliation claims. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).[15]

---

[14] Title VII prohibits retaliation based on a variety of protected categories, including race and sex, while § 1981 protects against race-based retaliation. *See Summers v. City of Dothan, Alabama*, 444 F. App'x 346, 351(11th Cir. 2011).

[15] There is no direct evidence of discriminatory retaliation here.

Under this framework, a plaintiff must first establish a *prima facie* case of retaliation under either statute by showing (1) she engaged in a protected activity, such as reporting discrimination, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Barnett*, 550 F. App'x at 714. In the retaliation context, an adverse employment action is one a reasonable employee would have found materially adverse. *Id.* (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). An employment action is materially adverse if it might well have dissuaded a reasonable employee from making or supporting a discrimination charge. *Id.* (citing *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68). If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2011). If the defendant does so, the burden shifts back to the plaintiff to show the proffered reason is pretextual. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007).

In her complaint, Curry alleged that in retaliation for reporting Huddleston sexually harassed her and told her "monkeys don't stop my show," she suffered materially adverse employment actions when Koch Foods moved her for the last

thirty minutes of her shift and constructively discharged her. (Doc. 1 at 11).[16] Koch Foods argues Curry cannot demonstrate the move was a materially adverse employment action and that, regardless, Koch Foods has articulated a legitimate, non-retaliatory reason for the action – to separate Curry from Huddleston in response to her claim he had sexually harassed her. (Doc. 44 at 33-36). Koch Foods also argues Curry cannot demonstrate she was constructively discharged. (*Id.* at 28-29, 35). Curry makes no argument in opposition to Koch Foods' motion for summary judgment on her retaliation claim.

Transferring an employee to a different position may constitute a materially adverse employment action if it involves a reduction in pay, prestige, or responsibility. *Corbett v. Beseler*, 635 F. App'x 809, 818 (11th Cir. 2015) (citing *Hinson v. Clinch Cty., Georgia Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000)). While Curry did not think she should be the one to move production lines and experienced embarrassment when making the move thirty minutes prior to the end of her shift, she admitted she performed the same job and received the same pay on the other line. (Doc. 45-1 at 49, 51-53). Because Curry did not suffer any reduction in pay, prestige, or responsibility, her transfer to a different production line for the last thirty minutes of her shift cannot constitute a materially adverse employment action for purposes of maintaining a retaliation claim. Moreover,

---

[16] The Eleventh Circuit has noted the term "monkey" may constitute a racial slur that supports a race-based harassment claim. *Jones*, 683 F.3d at 1297 (collecting cases).

Koch Foods has articulated a legitimate, non-retaliatory reason for moving Curry for the last thirty minutes of her shift. Curry offers no evidence or argument this reason is pretext. *See Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (noting that if plaintiff does not proffer sufficient evidence to create genuine issue of material fact as to whether defendant's articulated reason is pretextual, defendant is entitled to summary judgment on plaintiff's claim). Instead, she testified it was her understanding Koch Foods moved her so she did not have to work around Huddleston and that she did not think Koch Foods moved her to punish her. (Doc. 45-1 at 53).

Constructive discharge also may constitute a materially adverse employment action. *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1240 (11th Cir. 2001). Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable, thereby forcing the employee to quit. *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009). To prove constructive discharge, a plaintiff must show her work environment and the conditions of her employment were so unbearable a reasonable person would be compelled to quit. *Id.* The severity or pervasiveness of harassment required to prove constructive discharge is greater than that required to prove a hostile work environment. *Landgraf v. USI Film Products*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244 (1994); *see also Bryant*, 575 F.3d at 1298 ("Establishing a constructive

discharge claim is a more onerous task than establishing a hostile work environment claim.").

After Curry made her December 1, 2015 complaint, Koch Foods separated Curry from Huddleston, and Huddleston made only one additional harassing comment to Curry. Curry remained at Koch Foods until she accepted a job with another employer in June 2016. (Doc. 45-1 at 14-15). Under these circumstances, Curry has failed to produce sufficient evidence the conditions under which she worked at Koch Foods' Ashland plant were so intolerable she was required to resign or that any reasonable person would have been compelled to do so. *See, e.g.*, *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317-18 (11th Cir. 1989) (affirming district court's holding plaintiffs were not constructively discharged, where harasser was reprimanded several weeks before plaintiffs resigned and plaintiffs alleged only one additional incident of harassment occurred after reprimand); *Landgraf*, 968 F.2d at 430-31 (holding a reasonable employee would not have felt compelled to resign after measures reasonably calculated to stop the harassment were implemented), *aff'd*, 511 U.S. 244 (1994); *Johnson v. Wal-Mart Stores, Inc.*, 987 F. Supp. 1376, 1393 (M.D. Ala. 1997) (holding plaintiff's constructive discharge claim was not reasonable, where alleged harassment ceased more than two months before plaintiff's resignation); *Clark v. Johnson Controls World Servs.*, 939 F. Supp. 884, 891 (S.D. Ga. 1996) (holding plaintiff failed to

establish she was constructively discharged, where she had no contact with harasser after he was told to stay away from her and did not allege her job was affected in any way), *aff'd*, 124 F.3d 222 (11th Cir. 1997).

For the foregoing reasons, Koch Foods' motion for summary judgment on Curry's retaliation claims is due to be granted.

### C. Negligence

Sexual harassment is not an independent cause of action under Alabama law. *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 825 (Ala. 1999) (describing this as well-settled). Instead, allegations of sexual harassment are redressed through common law tort claims. *Id.* The Alabama Supreme Court has identified assault and battery, invasion of privacy, negligent training and supervision, and outrage as examples of those claims. *Id.* It has also held the manner in which a sexual harassment complaint is handled when sexual harassment has, in fact, occurred may form the basis of a negligent supervision claim. *Id.*

In her complaint, Curry claims Koch Foods had a duty to remedy and prevent sexual harassment of its employees by third parties and breached that duty after learning Huddleston was sexually harassing females working at its Ashland plant. (Doc. 1 at 13). Her summary judgment briefing makes clear Koch Foods' handling of Cofield's 2014 complaint is the primary basis for the alleged breach. (Doc. 50 at 38-40). Liberally construing that briefing, Koch Foods' lack of action

in response to Curry's November 2015 complaint is another basis for the alleged breach. (*Id.* at 40).[17] In light of Alabama law regarding claims available to redress sexual harassment allegations and Curry's summary judgment briefing, the undersigned construes the negligence claim Curry asserts against Koch Foods as one for the negligent supervision of McCollough, the Koch Foods' employee involved in Cofield's 2014 complaint, as well as Richey and Hawkins, the Koch Foods' employees involved in Curry's November 2015 complaint.

A claim for negligent supervision under Alabama law generally requires proof an employer knew or should have known of an employee's alleged incompetency. *Southland Bank v. A&A Drywall Supply Co., Inc.,* 21 So. 3d 1196, 1214-16 (Ala. 2008). An employer's actual knowledge of an employee's incompetency may be established by showing specific misdeeds of the employee had been brought to the employer's attention. *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001). An employer's constructive knowledge may be established by showing an employee's misdeeds were of such nature, character, and frequency that they must have been brought to the employer's attention. *Id.* Moreover, an employee's mistake or single act of negligence does not establish incompetence. *Southland Bank*, 21 So. 3d at 1216.

---

[17] This liberal construction is based on Curry's reference to Koch Foods' "complete failure to pursue the options available to it either in 2014 or *in 2015* . . . ." (Doc. 50 at 40 (emphasis added)).

"Negligence is not synonymous with incompetency. The most competent may be negligent." *Pritchett v. ICN Med. All., Inc.*, 938 So. 2d 933, 941 (Ala. 2006) (internal quotation marks omitted). Negligence sufficient to render an employee incompetent must be habitual. *Id.*

Curry has offered no evidence or argument McCollough, Richey, or Hawkins committed misdeeds so great in number or grievous in nature as to render any of these employees incompetent or that Koch Foods had actual or constructive knowledge of any such incompetence. Therefore, Koch Foods' motion for summary judgment on Curry's negligence claim is due to be granted.

### D. Intentional Torts

Curry asserts claims for invasion of privacy and assault against Huddleston and seeks to hold Koch Foods liable for Huddleston's tortious conduct on the theory Huddleston was Koch Foods' agent and Koch Foods ratified his conduct. (Doc. 1 at 12-14).

### 1. Invasion of Privacy

The invasion of privacy tort consists of four distinct wrongs, each with distinct elements. *S.B. v. Saint James School*, 959 So. 2d 72, 90 (Ala. 2006) (citing *Johnson v. Fuller*, 706 So. 2d 700, 701 (Ala. 1997)). Curry proceeds under the "wrongful intrusion" prong of the tort. A plaintiff asserting this type of invasion of privacy claim based on allegations of sexual harassment must show "(1) that the

matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998) (citing *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 323 (Ala. 1989)); *see also McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986) (defining "wrongful intrusion" species of invasion of privacy claim as "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities").

In *Phillips v. Smalley Maintenance Servs*., Inc., the Alabama Supreme Court held the elements of an invasion of privacy claim were met where the plaintiff was subjected to intrusive demands and threats of a sexual nature from her employer two or three times each week, including an inquiry as to the nature of sex between her and her husband, and these intrusions were made in a manner the court described as repulsive, including by striking the plaintiff's buttocks. 435 So. 2d 705, 711 (Ala. 1983). Then in *Busby*, the court held a reasonable jury could determine the plaintiffs' supervisor intruded into the plaintiffs' sex lives in an offensive and objectionable manner where the supervisor repeatedly directed lewd remarks and gestures toward the plaintiffs, attempted to follow one of the plaintiffs into the restroom and did follow one of the plaintiffs one night, openly stared at the

plaintiffs' sexual anatomy, put his arm around the plaintiffs, grabbed the plaintiffs' arms, and stroked the plaintiffs' necks. 551 So. 2d at 324. Finally, *in Ex parte Atmore Cmty. Hosp.*, the court held testimony the plaintiff's co-worker made several lewd comments to the plaintiff, asked the plaintiff to meet him outside of work hours for other than business purposes, and looked up the plaintiff's skirt on more than one occasion constituted substantial evidence the co-worker had invaded the plaintiff's privacy. 719 So. 2d at 1194.

Guided by *Phillips*, *Busby*, and *Ex parte Atmore Cmty. Hosp.*, the evidence Huddleston propositioned Curry for oral sex, including through the use of a lewd gesture; made a graphic inquiry about her female anatomy; commented on her sex life; questioned her sexual orientation several times; asked her to send him photographs of herself; suggested he could reach over and bite her lip; repeatedly attempted to initiate conversations with her about the sexual content of a book he insisted on loaning her; and, ultimately, made a graphic threat of sexual violence toward her would allow a reasonable jury to conclude Huddleston intruded on Curry's private affairs in a manner so offensive and objectionable as to cause a reasonable person outrage, mental suffering, and humiliation. *See also Scott v. Estes*, 60 F. Supp. 2d 1260, 1275 (M.D. Ala. 1999) (holding the plaintiff stated a claim for invasion of privacy by alleging the defendant repeatedly conditioned her receipt of a promotion on giving in to his sexual advances and that he sexually

assaulted her); *Johnson v. Wal-Mart Stores, Inc.*, 987 F. Supp. 1398, 1404-05 (M.D. Ala. 1997) (holding the defendant's attempts to kiss or fondle the plaintiff, his physical altercation with her in his office, and his subsequent and repeated comments about her appearance and dress could form the basis of a claim for invasion of privacy); *cf. McIsaac*, 495 So. 2d at 651 (affirming grant of summary judgment in defendants' favor on invasion of privacy claim where evidence showed that plaintiff's boss asked her to have an affair with him, looked at her suggestively, tried to kiss her, touched her arm, and put his arm around her); *Austin v. Mac-Lean Fogg Co.*, 999 F. Supp. 2d 1254, 1264 (N.D. Ala. 2014) (holding no reasonable jury could find supervisor liable for the tort of invasion of privacy based on his single sexual proposition of the plaintiff).

Huddleston argues an invasion of privacy claim requires evidence of both ongoing, persistent verbal harassment and unwanted physical contact. (Doc. 38 at 8). Decisions of this district court have noted that Alabama courts have generally required invasion of privacy claims to allege both ongoing, persistent verbal harassment and unwanted physical contact. *Austin*, 999 F. Supp. 2d at 1263; *Rose v. SMI Steel LLC*, 18 F. Supp. 3d 1317, 1321-22 (N.D. Ala. 2014); *Whitt v. Berckman's Foods, Inc.*, 2018 WL 1399263, at *7 (N.D. Ala. Mar. 20, 2018). The evidence Huddleston intentionally brushed Curry's breast when reaching for something – even if this contact was momentary and whether Curry reported it in

November or December 2015 – together with his physically threatening comments and conduct surrounding the book incident, satisfies any requirement of unwanted physical contact.

For the foregoing reasons, Huddleston's motion for summary judgment on Curry's invasion of privacy claim is due to be denied.

### 2. Assault

Under Alabama law, " '[a]ssault' has been defined as an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." *Wood v. Cowart Enterprises, Inc.*, 809 So. 2d 835, 837 (Ala. Civ. App. 2001) (internal quotation marks omitted) (emphasis omitted). Words standing alone do not constitute assault. *Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990); *Holcombe v. Whitaker*, 318 So. 2d 289, 294 (Ala. 1975). Words together with a show of force or other action may be sufficient to support an assault claim. *Allen*, 569 So. 2d at 351; *Holcombe*, 318 So. 2d at 294.

Huddleston threatened to "knock [Curry's] ass out" and "shove [his] dick so far up [her] [it] [would] come out [her] throat." (Doc. 45-1 at 31-32). Curry testified that when Huddleston made these threats, she thought he was going to

hurt her. (*Id.* at 34). She also testified that when Huddleston made one or both of these threats, he "was at [her] face," "was so mad and red," was "really, really serious," and was not far from a knife with which she worked. (*Id.*). The substance of Huddleston's threats, together with Curry's testimony regarding her perception of Huddleston's ability to physically harm her and the manner in which Huddleston made the threats, would allow a reasonable jury to conclude Huddleston assaulted Curry.

The defendants argue Curry did not have a well-founded fear Huddleston would carry out either of his threats. (Doc. 38 at 7; Doc. 44 at 42). They emphasize her testimony "[she] [couldn't] say [she] thought he was going to [carry out one or more of the threats]." (Doc. 38 at 7; Doc. 44 at 42). Curry finished that sentence by testifying, "but he might have . . . he could have done anything." (Doc. 45-1 at 34). One reasonable interpretation of Curry's testimony as a whole regarding the threats would be that while Curry did not believe Huddleston was going to carry out the threats literally, she believed he was going to physically harm her in some way. This interpretation – a view of the evidence most favorable to Curry, as required at this stage of the proceedings – supports Curry's assault claim.

The defendants also argue Huddleston did not have the apparent present ability to carry out either threat. (Doc. 38 at 7-8; Doc. 44 at 42). Huddleston notes

that when he made the threats, Curry was wearing steel-toed boots and had a long, sharp knife in her dominant hand and a full-coverage, chainmail-type glove on the other hand, while he was not holding a knife. (Doc. 38 at 8). He also notes Curry testified he had told her "his dick didn't work." (*Id.*). Koch Foods notes that after Huddleston's final threat, Curry shoved or slung the book toward Huddleston and loudly told Huddleston to "get out of [her] motherfucking face." (Doc. 44 at 42; Doc. 52 at 31-32). Some of this evidence merely underscores that there is a question of fact for resolution by a jury. Although it may cut against a finding that Curry had a well-founded fear Huddleston would harm her or that Huddleston had the present ability to do so, Curry has submitted sufficient conflicting evidence to create a jury question on her assault claim. *See Allen*, 569 So. 2d at 351-52 (holding defendant's act of shaking his finger in plaintiff's face, followed by his threats to "whip [the plaintiff's] ass anytime, anywhere," created jury question on assault claim, even though there was evidence plaintiff may have discounted threat); *Holcombe*, 318 So. 2d at 294 (holding that whether evidence was sufficient to arouse apprehension of harm or offensive conduct and whether defendant had apparent ability to effectuate threatened act were questions for the jury); *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986) ("When there is conflicting evidence . . . the issue of whether there was, in fact an assault and battery at all is a question for the jury.").

Whether Huddleston was physically capable of sexually assaulting Curry, Curry has presented sufficient evidence to create a jury question as to whether Huddleston had the present ability to physically harm her in some other way. Finally, it is unclear how Curry's act of shoving or slinging the book toward Huddleston and cursing at him in response to his graphic threat of sexual violence would negate any aspect of her assault claim, but in any event, that is a question for the jury to consider.

For the foregoing reasons, Huddleston's motion for summary judgment on Curry's assault claim is due to be denied.

### 3. Koch Foods' Liability

An employer is liable for intentional torts committed by its employee or agent if (1) the employee or agent committed the tort in furtherance of the employer's business, (2) the employee or agent committed the tort within the line and scope of his employment, or (3) the employer participated in, authorized, or ratified the tort. *Id.* at 1194; *Potts v. BE&K Const. Co.*, 604 So. 2d 398, 400 (Ala. 1992).

Agency may not be presumed. *Dickinson v. City of Huntsville*, 822 So. 2d 411, 416 (Ala. 2001). A plaintiff must present substantial evidence of an agency relationship. *Id.* An agency relationship may be demonstrated by actual or

apparent authority. *John Deere Const. Equip. Co. v. England*, 883 So. 2d 173, 178-79 (Ala. 2003).

The test for determining the existence of an agency relationship based on actual authority is whether the alleged principal exercised the right to control the alleged agent's performance. *Id.* at 178 (citing *Malmberg v. American Honda Motor Co., Inc.*, 644 So. 3d 888, 890 (Ala. 1994)). Curry claims Huddleston possessed actual authority over Inspector Helpers, including her. (Doc. 50 at 43). To the extent this claim is intended as an argument Huddleston was Koch Foods' actual agent, it fails. Curry points to no evidence that would support a determination Koch Foods had any right to control Huddleston's performance.

The test for determining the existence of an agency relationship based on apparent authority is whether the alleged principal held the alleged agent out to third parties as having the authority to act. *Bain v. Colbert Cty. Northwest Alabama Health Care Auth.*, 233 So. 3d 945, 956 (Ala. 2017) (citing *Malmberg*, 644 So.3d at 891). Additionally, the third party's belief an individual was the principal's agent must have been objectively reasonable. *Bain*, 233 So. 3d at 956-57 (citing *Brown v. St. Vincent's Hosp.*, 899 So. 2d 227, 239 (2004)). Finally, the third party must have actually relied on the individual's apparent authority. *Id.* (citing *Brown*, 899 So. 2d at 237).

Curry argues Huddleston was Koch Foods' apparent agent because Koch Foods held out Huddleston as having the right to direct her work and the work of other Inspector Helpers. (Doc. 50 at 43). To support this argument, she cites Koch Foods' job description for Inspector Helpers, which states these Koch Foods' employees "follow the government inspector's instructions to properly mark and/or pull below standard birds from the processing line." (Doc. 46-2 at 119). It is doubtful a private enterprise's instruction to its employee that the employee must follow the directions of a government regulator the enterprise is required to have on its premises makes the government regulator an agent of the private enterprise. However, determination of the issue is unnecessary. Even if Huddleston was Koch Foods' apparent agent, Curry has failed to demonstrate her reliance on that agency. She makes no argument she relied on the appearance Huddleston was Koch Foods' agent and falls far short of presenting more than a scintilla of evidence of reliance. Absent evidence Huddleston was Koch Foods' agent, there is no basis for holding Koch Foods' liable for Huddleston's intentional torts. Accordingly, Koch Foods's motion for summary judgment on Curry's invasion of privacy and assault claims is due to be granted.

## IV. CONCLUSION

For the foregoing reasons, Koch Foods' motion for summary judgment (Doc. 43) is **DENIED** as to Curry's "hostile work environment" sexual harassment

claim. The motion is **GRANTED** as to Curry's retaliation, negligence, invasion of privacy, and assault claims, and those claims against Koch Foods are **DISMISSED WITH PREJUDICE**. Huddleston's motion for summary judgment (Doc. 37) is **DENIED**.

     **DONE** this 20th day of March, 2019.

STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE